UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

MALRY TARDD, and OTTO WHITE

                       Plaintiffs,

      -against-

BROOKHAVEN NATIONAL LABORATORY, a.k.a
and/or d/b/a BROOKHAVEN SCIENCE ASSOCIATES,
CONRAD FORSTER, in his individual and official
capacity; MICHAEL GOLDMAN, in his individual and
official capacity; WILLIAM HEMPFLING, in his official
and individual capacity; SUE FOSTER, in her official and
individual capacity; WALTER DEBOER, in his official
and individual capacity; STEVE DIERKER, in his official
and individual capacity; ED HAAS in his official and
individual capacity; MICHAEL CARUSO, in his official
and individual capacity; MICHAEL BEBON in his official
and individual capacity; DEREK LOWENSTEIN, in his
official and individual capacity; WILLIAM GUNTER in
his official and individual capacity; THOMAS
SHERIDAN in his official and individual capacity;
PETER PAUL, in his official and individual capacity;
KENNETH BROG in his official and individual capacity

                       Defendants.

--------------------------------------------------------------------X

**Docket No.: CV-04-3262**
(ADS) (ARL)

**AMENDED
COMPLAINT**
*Jury Trial is Demanded*

Plaintiffs,  MALRY TARDD, and OTTO WHITE, by and through their attorneys, THE

LAW OFFICES OF FREDERICK K. BREWINGTON, provide this second Amended Complaint

against the defendants  as per stipulation and agreement and state and allege as follows:

## PRELIMINARY STATEMENT

1.     This is a civil action seeking monetary relief, injunctive relief, a declaratory

judgment, compensatory and punitive damages, disbursements, costs and fees for violations of the

Plaintiff's rights, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

1

et seq, 42 U.S.C. § 2000e et seq. (as amended), 42 U.S.C § 1981, 42 U.S.C § 1983, 42 U.S.C § 1985, 42 U.S.C § 1986, New York State's Human Rights Law, Executive Law § 296 and Breach of Contract.

2.      Specifically, the Plaintiff OTTO WHITE alleges that the Defendants negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive him of his employment, position, title and pay through misrepresentation, misinformation, harassment and retaliation.

3.      Plaintiff OTTO WHITE alleges that Defendants, purposefully and intentionally discriminated against him based upon his race and/or color and retaliated against him by harassing and wrongfully terminating him because of his opposition to such discriminatory practices.

4.      Said acts against Plaintiff, OTTO WHITE, were done knowingly, purposely, and with all intentions of depriving him of his right to be free of discrimination within his employment at BROOKHAVEN NATIONAL LABORATORY.

5.      Plaintiff MALRY TARDD  alleges that Defendant, through its employees, agents, associates, and affiliates purposefully and intentionally discriminated against Plaintiff based upon his race/color and retaliated against him because of his opposition to such discriminatory practices.

6.      Plaintiff MALRY TARDD alleges that Defendant, through its employees, agents, associates, and affiliates purposefully and intentionally discriminated against Plaintiff based upon his race/color by allowing pervasive discriminatory practices and racially-motivated attacks against him.

7.      Plaintiff MALRY TARDD alleges that BROOKHAVEN NATIONAL LABORATORY is aware and has full knowledge of the racial attacks against him but did nothing

2

and continues to do nothing to prevent and cure same. Instead, BROOKHAVEN NATION LABORATORY retaliated against MALRY TARDD and facilitated a racially biased and hostile environment, therefore ratifying the racist/racially biased and/or racially insensitive actions of its employees/agents.

8.     Said acts against MALRY TARDD are on-going and continue to the present.

9.     Said acts were done knowingly, purposely, and with all intentions of depriving Plaintiff, MALRY TARDD, of his right to be free of discrimination within his employment at BROOKHAVEN NATIONAL LABORATORY.

## JURISDICTION AND VENUE

10.     The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

11.     This Court is requested to exercise pendant jurisdiction with respect to Plaintiff's State Law claims pursuant to 28 U.S.C. § 1367.

12.     Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391, based on the fact that Plaintiffs' residences and the place where the unlawful employment and discriminatory practices complained of herein occurred in Suffolk County.

13.     Prior hereto, Plaintiff, OTTO WHITE, filed a charge with the United States Equal Employment Opportunity Commission (hereinafter "EEOC"), under EEOC Charge No. 160-2003-01802. Based upon the information provided to the EEOC by OTTO WHITE during the investigation, the EEOC could not conclude that the defendant's actions violated Federal Law.

14.     On May 10, 2004, a notice of Right to Sue letter, issued by the Equal Opportunity Commission with regard to EEOC Charge No. 160-2003-0180, was mailed to OTTO WHITE. The notice of Right to Sue Within 90 Days was received by the OTTO WHITE on or about May 14,

2004.

15.     Prior hereto, Plaintiff, MALRY TARDD,  filed a charge with the United States Equal Employment Opportunity Commission (hereinafter "EEOC"), under EEOC Charge No. 160-2002-00995. The charge was amended on two separate occasions, first in May 2002 and in April 2004.The EEOC could not conclude that the defendant's actions violated Federal Law.

16.     On April 30, 2004, a notice of Right to Sue letter, issued by the Equal Opportunity Commission with regard to EEOC Charge No. 160-2002-00995, was mailed to MALRY TARDD.  The notice of Right to Sue Within 90 Days was received by MALRY TARRD on or about May 3, 2004.

17.     MALRY TARDD currently has an on-going investigation in the New York State Division of Human Rights (case no: 2-E-OR-02-3506784-E) with regard to discriminatory and retaliatory practices against him by Defendant, BROOKHAVEN NATIONAL LABORATORY, and its agents/ employees.

## PARTIES

18.     Plaintiff, MALRY TARDD (hereinafter, "Mr. Tardd") ,  is an African-American male. He  resides in Suffolk County, State of New York and is presently 48 years of age, being born on August 25, 1955.MR. TARDD graduated from Westhampton High School in 1974 and has been working for the Defendant, BROOKHAVEN NATIONAL LABORATORY from 1975 to the present. In 1975, MR. TARDD was employed with BROOKHAVEN NATIONAL LABORATORIES as a Mechanical Technician. MR. TARDD has since held various positions within BROOKHAVEN NATIONAL LABORATORY and has attended/completed dozens of training courses during his tenure. Currently, Mr. TARDD is employed with in BROOKHAVEN

NATION LABORATORY as a Vacuum Technical Specialist (Technical Associate II).

19.     Plaintiff OTTO WHITE (hereinafter "Mr. White"),  is an African-American male. He  resides in Suffolk County, State of New York and is presently 61years of age, being born on July 20, 1943. MR. WHITE obtained a Bachelors of Science in Chemistry and a Masters of Science in Public Health from the University of North Carolina in 1965 and 1967, respectively. MR. WHITE is a member of several professional/scientific organizations and has written over 38 major technical papers for the scientific community. MR. WHITE began his employ with Defendant, BROOKHAVEN NATIONAL LABORATORY, as an industrial hygienist in November 1974. MR. WHITE held various positions within BROOKHAVEN NATIONAL LABORATORY during his tenure with same. In November 2003, when MR. WHITE was separated from BROOKHAVEN NATIONAL LABORATORY, he was a Division Manager within the Safety and Health Services Division. OTTO white worked for Brookhaven National Laboratories for a total of 29 years.

20.     Defendant, CONRAD FORSTER was at all relevant times to this complaint, the Manager of Mechanical Section at BROOKHAVEN NATIONAL LABORATORY and is sued herein in his individual and official capacity.

21.     Defendant, MICHAEL GOLDMAN was at all relevant times to this complaint, General Counsel of BROOKHAVEN NATIONAL LABORATORY and is sued herein in his individual and official capacity.

22.     Defendant, WILLIAM HEMPFLING was at all relevant times to this complaint the Manager of Personnel (Human Resources) at BROOKHAVEN NATIONAL LABORATORY and is sued herein in his individual and official capacity.

23.     Defendant, SUE FOSTER was at all relevant times to this complaint, working in

5

Employee Relations at BROOKHAVEN NATIONAL LABORATORY and is sued herein in her individual and official capacity.

24.     Defendant, WALTER DEBOER was at all relevant times to this complaint, a Supervisor at BROOKHAVEN NATIONAL LABORATORY and is sued herein in his individual and official capacity.

25.     Defendant, STEVE DIERKER was at all relevant times to this complaint, the Chairman of Lightsource at BROOKHAVEN NATIONAL LABORATORY and is sued herein in his individual and official capacity.

26.     Defendant ED HAAS was at all relevant times to this complaint the Mechanical Department Head at BROOKHAVEN NATIONAL LABORATORY and is sued herein in his individual and official capacity.

27.     Defendant, KENNETH BROG, was at all times relevant to this complaint, the Assistant Laboratory Director for Environment, Safety, Health and Quality, the Interim Assistant Laboratory Director for Environment, Safety, Health and Quality and also a member of the selection committee for the Assistant Lab Director for the Environmental, Safety, Health and Quality Department.

28.     Defendant, THOMAS SHERIDAN, was at all times relevant to this complaint, the Deputy Director of Operations, who at times was directly responsible for the Environment, Safety Health and Quality Directorate and was also a member of the selection committee for the Assistant Laboratory Director for Environment, Safety, Health and Quality.

29.     Defendant, PETER PAUL, was at all times relevant to this complaint, the Deputy Director for Science and Technology and was, at times, also the Interim Laboratory Director.

6

30.     Defendant, MICHAEL BEBON, was at all times relevant to this complaint, the Assistant Laboratory Director for Facilities and Operations and was also a member of the selection committee for the Assistant Laboratory Director for Environment, Safety, Health and Quality.

31.     Defendant, DEREK LOWENSTEIN, was at all times relevant to this complaint, Chair of the Collider-Accelerator Department and was also a member of the selection committee for the Assistant Lab Director for the Environmental Safety, Health and Quality Department.

32.     Defendant, WILLIAM GUNTHER, was at all times relevant to this complaint, the Special Assistant for Associate Director of the Life Sciences Directorate and was also a member of the selection committee for the Assistant Lab Director for Environmental, Safety, Health and Quality.

33.     Defendant, BROOKHAVEN SCIENCE ASSOCIATES, a.k.a and/or d/b/a BROOKHAVEN NATIONAL LABORATORY (hereinafter collectively referred to as "BROOKHAVEN" OR "BNL")  was formed as a partnership between Battelle Memorial Institute and The Research Foundation of the State University of New York on behalf of The State University of New York at Stony Brook. Upon information and belief, BNL conducts research in the physical, biomedical, and environmental sciences, as well as in energy technologies. BNL's main facility is located in Suffolk County. BNL has a staff of about 3,000 scientists, engineers, technicians and support staff and it hosts over 4,000 guest researchers annually. Upon information and belief, BNL receives federal funding and grants.

## FACTUAL ALLEGATIONS

## MALRY TARDD:

34.     Instant action is not the first time that the defendant, BNL, has received a complaint

7

from Plaintiff, Mr. TARDD, based upon the racially motivated, discriminatory practices of the employees/agents of BNL within BNL's facility. In 1996, Mr. TARDD filed a complaint for racial discrimination with respect to hiring and promoting practices in the New York State Division of Human Rights (hereinafter, "NYSDHR") against BNL[1].

35.    After an investigation of the prior proceeding mentioned above, the NYSDHR found that there was probable cause to believe that BNL engaged in unlawful discriminatory practices. The NYSDHR then scheduled the matter for a hearing. Before the aforementioned hearing took place, TARDD and BNL entered into a stipulation of settlement. As per the settlement, TARDD: [1] was promoted to a T-4 position, [2] received back-pay, and [3] was appointed to the position of a Equal Opportunity Representative (EEO Rep) for BNL. Among other things,  TARDD'S task as an EEO Rep included observing and analyzing BNL'S operations in order to make sure that BNL was complying with equal opportunity mandates, and establishing different guidelines/initiative in order to prevent BNL from carrying out discriminatory practices in the future.

36.    During the time that the settlement agreement was being finalized, MR. TARDD began to suffer from retaliation and racially biased attacks at the hands of the employees, staff, and/or agents of BNL. Said retaliation and racially biased attacks were in response to the discrimination complaint that MR. TARDD filed with the NYSDHR.

37.    Among the other examples of retaliation and racially biased attacks was an incident in which MICHAEL CARUSO, an employee of BNL, was observed by MR. TARDD (as well as other employees) parading throughout the work area wearing a white Ku Klux Klan hood with the

---

[1] *Ref. Malry Tardd against Brookhaven National Laboratory Associated Universities, Inc*., NYSDHR Case no. 2-E-R-96-3503679.

letters "KKK" clearly written on the side of the hood in black magic marker.

38.     MR. TARDD was able to seize the KKK hood and present the KKK hood

to his supervisor WALTER DEBOER and other authoritative/supervisory figures in BNL. MR.

TARDD also voiced his complaints about the KKK hood to Mr. Mike Goldman, who served as

BNL'S legal counsel at that time.

39.     The KKK Hood and MR. TARDD'S clear expressions of discontent were

disregarded and treated as a joke/prank by WALTER DEBOER, other supervisors and managers,

as well as MR. TARDD'S co-workers (who were all Caucasian).

40.     Upon information and belief, BNL never took disciplinary action nor did it verbally

reprimand or warn MICHAEL CARUSO  for wearing the KKK hood and/or for parading around

the work area wearing said KKK hood despite MR. TARDD'S complaints.

41.     In or about August 2001, after the settlement stipulation between MR. TARDD and

BNL was signed, MR. TARDD discovered a rope, tied into the form of a "hangman's noose",

draped and hung over the door to his office.

42.     MR. TARDD refused to remove the "hangman's noose." Instead, MR. TARDD left

the "hangman's noose" in place and reported the noosed to BNL'S Management and also to BNL'S

legal Counsel MICHAEL GOLDMAN.

43.     BNL, its staff, agents, employees failed to investigate the "hangman's noose", or
        take

any other action with respect to the hangman's noose. MR. TARDD was eventually forced to

remove the "hangman's noose" on his own.

44.     The hangman's noose was hung above MR. TARDD'S door in retaliation for his

filing and settling his original discrimination claim against BNL.

45.     Also in August 2001, a handwritten sign bearing the words "HYPOCRITE" was hung on Mr. TARDD's office wall. This sign was removed by a supervisor. Shortly thereafter, the sign was put back up on MR. TARDD's office wall. This incident was also reported to management and also to BNL'S counsel, Mike Goldman. BNL failed to take any action with regard to this harassment.

46.     Also in August 2001, a doll that was hanging on a string by its neck was hung outside

of MR. TARDD's office door. Mr. TARDD left the doll in place and reported the presence of the doll to his supervisors, to Management and BNL'S Counsel, MICHAEL GOLDMAN. However, BNL failed to take any action with respect to the doll. In fact, the doll was left hanging in the same position for an entire week until it was eventually removed.

47.     Since the NYSDHR stipulation and settlement was signed in August 2001, MR. TARDD has faced an increasingly hostile work environment from his supervisors and co-workers at BNL. For example, MR. TARDD'S immediate supervisor, WALTER DEBOER began communicating with TARDD as little as possible. DEBOER also began delegating assignments to TARDD that often required the attention of multiple people. However, DEBOER would not provide assistants or help to TARDD to complete said tasks.

48.     Although TARDD completes all of the tasks assigned to him, he is not given the opportunity to perform tasks that will enable him to become eligible for a higher grade.

49.     In furtherance of its retaliatory purpose, TARDD has often been purposefully excluded from office gatherings and meetings, with the approval of management.

50.     The word nigger is often used by TARDD'S white co-workers without repercussion. MR. TARDD'S supervisors and managers never took any action in response to MR. TARDD'S complaints about the use of the word nigger by his co-workers. Instead, the supervisors and management at BNL replies that MR. TARDD is "too sensitive."

51.     After the NYSDHR stipulation and settlement was signed in August 2001, MR. TARDD suddenly began receiving weak job performance evaluations and the lowest pay raises in his group.

52.     Upon information and belief, MR. TARDD evaluations were consistently satisfactory before said NYSDHR settlement and stipulation. The quality of MR. TARDD's work had not changed after the stipulation was entered into.

53.     Upon information and belief, MICHAEL CARUSO, the employee that paraded around BNL wearing a KKK hood, was given a higher performance evaluation than MR. TARDD.

54.     After MR. TARDD complained to BNL that his poor evaluation and pay raise was a result of retaliation for his filing the NYSDHR complaint, BNL adjusted MR. TARDD's pay slightly higher.

55.     During the period from August 2001 to March 2002, TARDD made numerous complaints to management, including CONRAD FORSTER and ED HAAS, but no action was and/or has been taken to prevent or to even investigate any of MR. TARDD'S complaints.

56.     Upon information and belief, no other similarly-situated Caucasian employees at BNL were and/or are subjected to the same disparate treatment as mentioned above in paragraphs 31 through 50.

57.     In March 2002, the human resources manager, WILLIAM HEMPFLING, advised Co-Plaintiff OTTO WHITE (who was the Manager of BNL's Safety and Health Services Division at the time) that the Human Resources Department had problems working with TARDD. HEMPFLING then asked OTTO WHITE to "mentor" TARDD.

58.     WILLIAM HEMPFLING and BNL'S true goal with respect to assigning OTTO WHITE (an African American employee, who was a mid-level manager and had authority) as a "mentor" to TARDD, was to silence TARDD and/or to hinder TARDD from voicing his concerns about the racial abuses he faced at BNL by BNL and its agents and employees.

59.     WILLIAM HEMPFLING and BNL's motive with respect to assigning OTTO WHITE (an African American employee, who was a mid-level manager and had authority) as a mentor, was to hinder MALRY TARDD'S progress and development as a newly appointed EEO Rep at BNL.

60.     As TARDD'S newly appointed "mentor" OTTO WHITE developed an initiative called the "path forward plan." The path forward plan was designed to improve TARDD's work environment by providing steps that TARDD and BNL's Management would use to diffuse the hostile work environment and improve communication.

61.     In March 2002, a meeting was held between TARDD, managers,  and Human Resource Department personnel to discuss the path forward "plan", among other things. Mr. TARDD, WILLIAM HEMPFLING (white), MICHAEL GOLDMAN(white), STEVE DIERKER (white), ED HAAS (white) and co-plaintiff OTTO WHITE attended this meeting.

62.     During this meeting the parties discussed TARDD's position as EEO Rep. The parties also discussed developing a diversity agreement. However, during the same meeting, MR.

12

GOLDMAN and HEMPFLING stated to TARDD that his prior complaints regarding racial discrimination at BNL should not be investigated because they believed that it would be counterproductive to investigate past incidents while trying to move forward with the "plan".

63.     GOLDMAN and HEMPFLING tried to convince TARDD to drop his prior complaints about racism at BNL in order (or in exchange ) for a smooth path forward plan. MICHAEL GOLDMAN told TARDD that if TARDD agreed that BNL would not have to investigate and report the KKK incident it would be easier for TARDD to go forward with his career.

64.     TARDD rejected the "plan" because BNL was attempting to erase the most serious and offensive racially biased actions by its employees/agents without investigating said actions, punishing the perpetrators or ensuring against similar future acts. In an email communication to GOLDMAN after the meeting, TARDD explained that he agreed that moving forward in a positive manner was best. However, TARDD did not want his complaints about the racial attacks against him by BNL employees to be "swept under the rug."

65.     Once TARDD told GOLDMAN, that he refused to ignore the incidents of racial discrimination or sweep them under the rug, the retaliation against TARDD by BNL's management, employees and agents escalated.

66.     The Supervisors and Managers at BNL began suddenly giving TARDD poor and/or arbitrary performance evaluations and  scrutinizing TARDD and his work looking for errors and/or reasons to reprimand him.

67.     TARDD'S supervisor, WALTER DEBOER began keeping a log of TARDD'S breaks, lunch breaks, time away from his office, etc and other items that were not maintained as

against white employees.

68.     Upon information and belief, no other similarly-situated Caucasian employees at BNL, were and/or are subjected to the same treatment as mentioned above in paragraphs 60 and 61.

69.     Upon information and belief, no other similarly-situated Caucasian employees at in TARDD's specific work group (Vacuum Group) were and/or are subjected to the same treatment as mentioned above in paragraphs 60 through 68.

70.     On March 27, 2002 SUSAN FOSTER (Employee Relations) and WILLIAM HEMPFLING (Human Resources Manager) called TARDD into their office and accused TARDD of violating the rules because he spoke to other employees about an incident that was being heavily talked about amongst the employees in BNL. HEMPFLING and FOSTER stated that an EEO rep is not allowed to speak about such an issue and demanded that TARDD stop speaking to his co-workers [2]. HEMPFLING and FOSTER used this as an excuse to give TARDD a write-up in his file. When TARDD spoke to his EEO manager Loraine Merdon, she advised TARDD that he violated no rules by discussing the incident with his co-workers.

71.     Sometime thereafter, WILLIAM HEMPFLING and SUSAN FOSTER accused TARDD of talking to other employees about subjects that TARDD was not aware of. They gave TARDD a second letter and attempted to remove TARDD from his EEO Rep position. As a result, TARDD had to hire an attorney to assist him in retaining his EEO Rep position at BNL.

72.     In April 2002, TARDD filed a charge of retaliation against BNL with the Equal Employment Opportunity Commission (EEOC). After TARDD filed the charge, he was subjected to even more pressure and retaliation from BNL, its employees and agents.

---

[2] Who are all African Americans.

14

73.     In June 2002, Mike Loftus and MICHAEL GOLDMAN contacted Patrice Benjamin, who was part of a council assigned to investigate the TARDD's complaints. Loftus told Mr. Benjamin that he is to cease all investigations of TARDD's complaints of discrimination because TARDD filed a lawsuit against BNL. A week later the council voted, over Mr. Benjamin's objections, to terminate the investigation as a result of TARDD's EEOC complaint.

74.     BNL terminated the so-called investigation and closed the case in furtherance of its attempt to cover-up the discriminatory practices of its employees against TARDD.

75.     CONRAD FORSTER began sending harassing emails to Mr. TARDD and upper/lower level Management more than 30 emails, which contained false complaints, accusations and judgments about TARDD'S performance at work. On May 17, 2002, Forester issued a final report, which falsely accused TARDD of causing a work-related mishap, when in fact, TARDD had little to do with it.

76.     To date, BNL has not made any good faith attempts to investigate TARDD's initial complaints about the racially discriminatory actions by BNL's  employees.

77.     Instead of trying to find solutions to the problems and racial issues that were being raised by TARDD frequently, BNL attempted to cover up the problems and/or ignore the existence of racial and diversity problems at BNL. Rather, BNL treated TARDD, as if he were the problem simply because TARDD voiced his concerns.

78.     Instead of trying to find solutions to the problems and racial issues that were being raised by TARDD frequently, BNL attempted to cover up the problems and/or ignore the existence of racial and diversity problems at BNL. Rather,  BNL treated TARDD, as if he were the problem and mounted a harassment campaign against TARDD in retaliation for TARDD's refusal to stay

15

quiet.

79.     BNL never fully complied with the terms its agreement with TARDD, which resulted in the New York State Division of Human Rights' Order after Stipulation (Case no:2-E-R-96-3503679), dated August 1, 2001.

80.     BNL breached the agreement (between itself and Mr. Tardd), which resulted in the NYSDHR Order after Stipulation, dated August 1, 2001 by continuing its mistreatment, racial attacks, and blatant violations on the Human Rights Law of the State of New York after said stipulation was executed.

81.     BNL breached the agreement (between itself and Mr. Tardd), which resulted in the NYSDHR Order after Stipulation, dated August 1, 2001, by allowing its employees and agents to continue with their mistreatment, racial attacks and blatant violations of the Human Rights Law of the State of New York despite TARDD's complaints and pleas for help.

82.     BNL breached the agreement (between itself and Mr. Tardd), which resulted in the NYSDHR Order after Stipulation, dated August 1, 2001, by taking affirmative steps to prevent and hinder TARDD'S initiatives, plans, and actions, as an EEO Rep. thereby preventing TARDD from bringing BNL into compliance with EEO Laws.

83.     On a daily basis, the Management and Supervisory staff at BNL subjected TARDD to repeated interrogations, false accusations, surveillance, and wrongful disciplines. In addition, BNL, its employees and agents began censoring TARDD's emails and destroying TARDD's memos in order to hinder his duties as an EEO Rep and also to hinder his duties as a Vacuum Technical Specialist. Among these Manager and supervisors are CONRAD FORSTER (Manager of Mechanical section), MICHAEL GOLDMAN (General Counsel), WILLIAM HEMPFLING

16

(Manager of Personnel), SUE FOSTER (Employee Relations), WALTER DEBOER (Supervisor), STEVE DIERKER(Chairman of Lightsource) and ED HAAS (Mechanical Department Head).

84.    Since MR. TARDD filed his complaint with the EEOC, he has been subjected to a continuous pattern of retaliation and discrimination.

85.    Mr. TARDD was told by a supervisor that if he objects, complains, or states that he feels he is being discriminated against, he will be punished for insubordination.

86.    Since the EEOC filing, Mr. Forester sent emails to TARDD and to Mr. Goldman stating that he has been questioning all employees about the racially motivated incidents in the lab. Mr. Forester also explained that none of the employees would talk about the incidents. This was an attempt by Mr. Forester to hinder and or stifle an investigation and to make TARDD feel as thought there was no use in investigating the matter.

87.    BNL also informed TARDD that he would have to make up any time he took to go to doctor's appointments. Upon information and belief, Management has also been looking into past sick leave that TARDD has taken, in order to make TARDD make-up those hours as well. In addition, Ed Haas requested a diagnosis (as opposed to a doctor's note) from TARDD's therapist in order to justify TARDD's visits. TARDD, like all of the other employees in TARDD's title, is entitled to unlimited sick leave.

88.    TARDD was given a quantifiable guideline that he must satisfy in order to get a pay raise. All of the T-4 employees were supposed to receive the same guidelines. However, upon information and belief, TARDD was the only employee that received these guidelines.

89.    In December 2003, MR. TARDD received his job performance evaluation for the 2003 fiscal year. Mr. TARDD'S performance was rated as needing improvement. As a result,

17

TARDD  received only a 1.5% increase in his salary.

90.    This poor performance evaluation was further retaliation for TARDD'S, then

pending, EEOC charge in addition to the numerous other complaints of discrimination that Mr.

TARDD made against BNL,  its agents and employees in the past.

91.    Before TARDD filed his complaint with the EEOC, TARDD's performance

evaluations were always satisfactory. After the EEOC charge was filed, MR. TARDD's performance

evaluation scores dropped significantly and his evaluations suddenly became poor. BNL, in its

evaluations, would overlook and ignore factors that contribute to a high evaluation score, while

fabricating and arbitrarily injecting factors to decrease TARDD's performance scores.

92.    Another example of BNL's on-going abuse against TARDD is that on March 9,

2004, Mr. TARDD used his earned accumulate sick time, which was his to be used, in order to take

care of a sick family member. BNL has a "Sick Family Member" policy in which employees are

allowed to used their sick days in order to take care of sick family members. In an unprecedented

move, BNL accused TARDD of misuse of his sick time and subjected MR. TARRD to punishment

(suspension for five days) without allowing MR. TARDD the opportunity to provide a response

and/or to prove proper use of the time.

93.    BNL, its employees and agents purposefully and intentionally created a work

environment for TARDD that was intolerable and hostile.  Thus BNL, in furtherance of its

discriminatory purpose, made it impossible for TARDD to succeed, grow and/or excel at his job.

94.    Upon information and belief, no similarly situated Caucasian employees at BNL

              have

been subjected to the type of abuses and mistreatment as outlined in paragraphs 60 through 93

18

above.

**OTTO WHITE:**

95.     OTTO WHITE was an employee of BNL from November 1974 through November 2003 (29 years). MR. WHITE began his 29 year tenure at BNL as an Industrial Hygienist and was promoted several times to the position of Division Manager of Safety and Health Services when he was terminated by BNL.

96.     In or around March 2002, TARDD approached WHITE to voice his concerns about an arbitrary and unfair performance evaluation that he received from his supervisors. During this discussion, TARDD showed WHITE photos of the Ku Klux Klan hood that was worn by his co-worker. TARDD also showed WHITE photos of the hangman's noosed that was placed over his door. TARDD also told WHITE about how he voiced his complaint to supervisors and management to no avail. It was at this point that WHITE became aware that TARDD was being subjected to racially motivate and biased attacks at BNL.

97.     WHITE was clearly upset about TARDD'S complaints and the photographs the were shown to him by TARDD. Soon after his meeting with TARDD, WHITE called the Human Resources Director, HEMPFLING. HEMPFLING visited WHITE'S office soon after.

98.     During this conversation, HEMPFLING told WHITE that the Human Resources Department had been having problems and difficulties with TARDD. HEMPFLING then asked WHITE to serve as a "mentor" to TARDD. WHITE accepted Hempfling's suggestion and became a "mentor" to TARDD.

99.     HEMPFLING and BNL'S intention for suggesting that WHITE (An African-American with management authority) become TARDD's "mentor" was that WHITE would

somehow be able to silence and/or control TARDD and prevent TARDD from voicing his racial discrimination concerns at BNL.

100.    HEMPFLING and BNL, attempted to use WHITE as a tool to censor and stifle TARDD. However, WHITE acted contrary to what BNL and Hempfling expected.

101.    Once WHITE became a mentor to TARDD, WHITE witnessed and observed the mistreatment about which TARDD was complaining. More specifically, WHITE witnessed the arbitrary, non-quantitative performance evaluations that was given to TARDD. WHITE witnessed how BNL and its employees/agents mistreated TARDD on account of his race.

102.    In response, WHITE began to utilizing his management skills to develop plans and initiatives in an effort to correct the discriminatory practices and hostile racial atmosphere in BNL. For example, WHITE worked with ED HAAS (who was Tardd's supervisor at the time) to create a more quantifiable evaluation procedure for T-3s and T-4s. WHITE's aim was to limit BNL's evaluation process which was being unfairly applied in a discriminatory manner and adversely affected minorities.

103.    Upon information and belief, ED HAAS implemented the evaluation plan, that was created by WHITE, to TARDD alone and not to the other T-3s and T-4s equally.

104.    WHITE also developed and initiative for TARDD called the "path forward plan."

105.    The path forward plan was designed to improve TARDD'S work environment by providing steps that TARDD and BNL would use to diffuse the hostile working environment and to improve communication. The Path forward plan was also designed to level the playing field and correct the apparent disparities between minority employees at BNL and their white co-workers.

106.    In March 2002, WHITE introduced this plan to some managers, supervisors and

Human Resources personnel at BNL while at a meeting in which TARDD was present. Also present

at this meeting was WILLIAM HEMPFLING Hempfling (white), MICHAEL GOLDMAN(white),

STEVE DIERKER (white) and ED HAAS (white).

107.    The Path forward plan, created by WHITE called for, among other things:

- Completing Department wide sensitivity training

- Communicating to all NSLS staff and the entire Laboratory that harassment of any type is not acceptable and will not be tolerated

- Scheduling periodic meetings between NSLS Chair and EEO Rep (Malry Tardd).

- Arranging for team building exercises for NSLS Vacuum Group

- Reviewing and modifying descriptions and qualifications for technician job classifications

- Conducting an analysis of BNL technicians (time in grade, promotion experience, salary, education, and sex/ethnic group

- Monitoring complaint process to ensure that complainant is not treated as perpetrator instead of the victim

- Investigating Racial Harassment claims and taking appropriate actions

108.    At first, BNL and its management showed slight interest in the plan at this meeting.

However, BNL refused to accept the plan unless TARDD dropped his past discrimination claims

and forget about the KKK hood, the hangman's noose and the paper doll incidents. More

specifically, the management at BNL suggested that the path forward plan could not move forward

until TARDD withdrew his racial discrimination claims, thus, negating  BNL's need to conduct an

21

investigation into these claims.

109.    TARDD felt that accepting BNL's offer, would enable BNL to avoid the very serious and unacceptable acts of discrimination committed by its employees/agents, thereby, leaving the acts unpunished and also leaving the door open for future discriminatory acts by BNL. Hence, TARDD rejected BNL's suggestion. As a result and in retaliation, BNL rejected the path forward plan and refused to consider the plan.

110.    After BNL rejected WHITE'S plan forward, the hostile work environment and discriminatory practices at BNL continued and escalated.  BNL did nothing to address and/or rectify the discrimination.

111.    TARDD continued his attempts to act in accordance with his EEO Rep. position. TARDD continued to send out mass e-mails, memos, and communications to management and supervisors at BNL in an attempt to seek justice for the discriminatory actions directed against him. TARDD also fought, as an EEO Rep. to get BNL in compliance with EEO laws. BNL and its employees/agents continued its retaliatory efforts against TARDD. Eventually, TARDD filed a discrimination complaint with the Equal Employment Opportunity Commission (EEOC) against BNL.

112.    BNL rejected WHITE's path forward plan because TARDD refused to submit to BNL's suggestion to forget past discrimination. BNL refused to address the on-going discrimination because BNL, its employees and agents supported and facilitated a racially-biased and hostile work environment.

113.    BNL'S rejected the path forward plan when TARDD refused to submit to BNL'S suggestion to forget about past discrimination because BNL intended to use WHITE to

further a racially discriminatory purpose. BNL, its employees and agents sought to use WHITE and his path forward plans as leverage against TARDD in order to get TARDD to drop his discrimination complaints.

114. As a result of WHITE'S failure to further BNL'S discriminatory actions, and as a result of WHITE'S refusal to silence ("mentor") TARDD, BNL began to retaliate and discriminate against WHITE.

115. Throughout his 29 years at BNL, WHITE demonstrated his interests in pursuing an active role in promoting diversity, stopping racially discriminatory practices, investigating complaints of racial discrimination and creating race-friendly initiatives, BNL continued to actively retaliate and systematically discriminate against WHITE.

116. In August 2002, a few months after BNL rejected WHITE's path forward plan and as TARDD continued to openly address the problems at BNL, WHITE submitted his resume for and became a candidate for "Assistant Lab Director for the Environmental Safety, Health and Quality" (ALD) position, in which BNL had an opening.

117. KENNETH BROG (hereinafter "MR. BROG"), was OTTO WHITE'S supervisor for a substantial period of time prior to MR. WHITE'S candidacy for the Assistant Lab Director position.

118. Upon information and belief, MR. BROG was a member of BROOKHAVEN SCIENCE ASSOCIATES' management team, which was comprised of all white male members. MR. BROG served BNL in the capacity of Assistant Laboratory Director for Environment, Safety, Health and Quality.

119. Upon information and belief, in historical context, MR. BROG always showed

preference towards Caucasians with respect to the hiring and placement of management. Although OTTO WHITE had extensive experience and qualifications of which BROG was aware, BROG often and intentionally overlooked WHITE with regard to promotions and advancement into other management positions. Instead, BROG actively stifled WHITE's advancement at BNL limiting WHITE'S to a Deputy Division Head position of a much smaller safety division.

120.    Upon information and belief, and more specifically, BNL'S past hiring practice demonstrates a preference towards hiring and promoting qualified employees from the inside first, as opposed to soliciting non-employees from the outside to fill job openings.

121.    Nevertheless, BROG often brought in new white managers with less experience and knowledge of BNL than WHITE and refused to consider WHITE for these higher-level positions.

122.    WHITE remained as Deputy Division Head of the smaller unit until the BSA appointed manager resigned. Upon information and belief, BROG reluctantly appointed WHITE after WHITE complained to the Laboratory Director about BSA'S and BNL'S lack of diversity in its management team.

123.    Although WHITE acquired the new management position, BROG did not give WHITE the recognition, state-wide announcement, or additional compensation commensurate with the title.

124.    Upon information and belief, no similarly-situated Caucasian employees were given promotions and/or new positions at BNL without the salary increase and recognition equivalent thereto.

125.    BROG's hostility toward WHITE continued throughout BROG'S term as Assistant Laboratory Director for Environment, Safety, Health and Quality. More specifically, BROG showed

favoritism toward his Caucasian appointed managers with respect to appointments and resources. Furthermore, when BROG decided to retire his position at BNL, BROG pushed the advancement of one of his white managers as his successor.

126.    Upon information and belief, BROG was opposed to WHITE'S position as a division Manager because WHITE was an African American who actively spoke out against the discriminatory practices that were prevalent at BNL.

127.    In the year 2000, BROG decided to retire and resign his appointment at BNL.

128.    As mentioned above, BNL'S past hiring practice demonstrates a preference towards hiring and promoting qualified employees from the inside first, as opposed to soliciting non-employees from the outside to fill job openings.

129.    Because of his extensive professional background and experience, WHITE was well qualified for the position of Associate Lab Director for the Environmental Safety, Health and Quality Department. In addition, WHITE had a 29 year history with BNL and was familiar with the schematics of BNL.

130.    WHITE was interviewed for the position in November 2002.

131.    WHITE was the only qualified internal candidate for the Associate Lab Director position.

132.    In August 2000, BROG was also a member of the Associate Lab Director selection committee (hereinafter "selection committee")and played a pivotal role in selecting the candidate for the position.

133.    More specifically, BROG advised BNL that he was willing to serve as an interim Assistant Laboratory Director for Environment, Safety, Health and Quality and that he would

identify and recommend three fully qualified candidates to serve as his predecessor.

134.    Upon information and belief, WHITE was the only qualified internal candidate that applied for the Assistant Lab Director position. Upon WHITE submitting his application for the position, BROG and THOMAS SHERIDAN, rendered the Assistant Lab Director position unavailable, halted the selection process and instead, delegated the Task of Assistant Lab Director to the Deputy of Operations. Plaintiff, White, was thereby prevented from having access to the position of Assistant Lab Director.

135.    In or about August 2002, due to recommendations from the Operations Committee, the Assistant Lab Director position/duties, which were delegated to the Deputy of Operation by BROG and SHERIDAN in September 2000, were severed from the Deputy of Operations responsibilities. As a result, the Assistant Lab Director position became available once again. BROG served as the interim Assistant Lab Director until the permanent Assistant Lab Director could be selected. BROG also spearheaded the committee which was convened to interview candidates for the position.

136.    Once again in September 2002, WHITE submitted his resume for the position and was the only internal candidate applying for the job. WHITE was interviewed for the senior position in November 2002.

137.    Among those in the committee convened to fill the Assistant Lab Director position were Defendants KENNETH BROG, THOMAS SHERIDAN, PETER PAUL, MICHAEL BEBON, WILLIAM HEMPFLING, DEREK LOWENSTEIN, and WILLIAM GUNTHER (all of whom are white males).

138.    Defendant THOMAS SHERIDAN (hereinafter "Sheridan"), was also a supervisor

26

of OTTO WHITE and was a Member/Chair of the Assistant Lab Director selection committee. On numerous prior occasions, WHITE had expressed to SHERIDAN, that he was mistreated by BROG and that BROG treated WHITE different than the other Division managers at BNL.

139.    Although SHERIDAN was the Chair of the selection committee and had knowledge and/or notice of WHITE'S complaints with respect to BROG and his mistreatment of WHITE, SHERIDAN, nevertheless, allowed BROG to assume a pivotal role in the selection process.

140.    Defendant, PETER PAUL (hereinafter "PAUL"), was an interim Laboratory Director during the relevant times of this case. WHITE also informed PAUL that the selection process was unfair and biased. In response to WHITE'S allegations, PAUL organized a meeting between WHITE and other authoritative figures at BNL

141.    During this meeting, PAUL attended for only a few minutes then exited. Before PAUL left the meeting, he advised WHITE that he would hold a follow-up meeting. After PAUL left, the meeting was adjourned shortly thereafter and there was no progress with respect to WHITE'S complaints.

142.    A few days after, WHITE approached  PAUL in the cafeteria at BNL to ask about and/or schedule the follow-up meeting that PAUL promised. When WHITE asked PAUL about a follow-up meeting, PAUL responded that he "wasn't allowed to talk about it." The follow-up meeting was never held and PAUL did nothing in response to WHITE'S complaints.

143.    PAUL, as the Laboratory Director, had the authority to supervise the selection process and to make sure that the process was fair. However, PAUL failed to do so even after he had notice that there may have been unfair and biased practices in the selection process.

144.    WILLIAM HEMPFLING, who was the director of Human Resources and who also

asked WHITE to "Mentor" TARDD, as discussed above, was also a member of the selection committee. HEMPFLING contributed to the biased selection process in furtherance of an on-going racially discriminatory motive and also in retaliation for WHITE'S failure/refusal to assist HEMPLFING in "Mentoring" TARDD.

145.    The collective members of the selection committee, discriminated against WHITE, in furtherance of a racially biased motive to prevent minorities from being appointed to high-level management positions. More specifically, the selection committee, which was appointed by BNL to select an Assistant Laboratory Director, denied the position to WHITE even though WHITE: [1] was the most qualified candidate; [2] was the only candidate that had over 27 years of experience at BNL; [3] was the only internal candidate applying for the position and [4] was the only African American applying for the position.  Instead, Upon information and belief, the selection committee filled the position with a caucasian male who had no prior experience/history with BNL and was less qualified than WHITE.

146.    In December 2002, without justifiable reason or adequate excuse, WHITE was informed that BNL did not select him for the Assistant Lab Director position. The refusal to select WHITE was based on his race and color.

147.    The selection process for the Assistant Lab Director significantly deviated from selection processes used for similar positions. Specifically, BNL usually appoints a selection committee  whose members represent a broad cross-section of stakeholders. For the Assistant Lab Director position, a fair cross section would have consisted of senior managers, middle managers Environmental Safety and health coordinators, and bargaining unit representatives. The selection committee for the position for Assistant Lab Director consisted of six, white, male, senior managers,

all of whom, upon information and belief, were aware of the WHITE'S opposition to discriminatory practices and his support of Plaintiff, TARDD.

148.    BNL, its employees and agents, specifically, the defendants named herein, deliberately minimized WHITE's chances during the selection process in furtherance of a discriminatory purpose.

149.    BNL has, consistently in the past and with respect to OTTO WHITE, refused to hire and/or promote highly qualified minorities into high-level management positions.

150.    BNL refused to promote, and subsequent constructive termination of OTTO WHITE to a high level management position in retaliation for his failure and/or refusal to silence and control (mentor) TARDD and TARDD's complaints.

151.    BNL refused to promote WHITE in furtherance of its discriminatory and historically demonstrated purpose of preventing and precluding minorities from progressing to high-level positions and senior management at BNL.

152.    BNL has refused to afford WHITE the proper recognition, promotions and/or salary commensurate with his tenure and performance. Upon information and belief WHITE received less compensation when compared to other similarly situated, Caucasian, Level II managers with similar tenure.

153.    Once WHITE began openly questioning the selection process and other various racial diversity issues at BNL (including the treatment of MR. TARDD), BNL, its employees and staff  became increasingly hostile towards WHITE and began a retaliation campaign against him, which eventually led to WHITE'S constructive termination.

154.    On or about June 27, 2003, WHITE filed a charge of discrimination against BNL

with the EEOC. Upon receipt of WHITE'S EEOC claim, BNL requested and received numerous extensions from the EEOC under the excuse that it was trying to "resolve the claim outside of the EEOC process."

155.    After several months with no action and/or proposed resolutions on the part of BNL, WHITE requested a meeting on the issue. At the meeting, WHITE was informed that the new director was not obliged to respond to his claims since White's claims "did not happen on his watch."

156.    Instead of being offered to position he deserved, WHITE  was then offered a one
        year
appointment as a special assistant to address diversity issues. WHITE, feeling type-cast, declined the offer because BNL sought to place him in a position that he knew would be futile and would compromise his honest attempt to combat discrimination.

157.    When WHITE informed BNL's Counsel that he would rather continue the EEOC process, BNL's counsel immediately advised WHITE that he is in an adversarial relationship with BNL and fostered the already hostile work environment.

158.    Once WHITE informed BNL's Counsel that he would rather continue the EEOC process, BNL, its agents and employees sought to alienate, retaliate against and create a hostile working environment for WHITE.

159.    Based upon BNL's representation that WHITE and BNL are "adversarial and at
        odds,
WHITE was forced to enter his resignation and reluctantly accept a severance package in order to preserve his dignity, self respect, mental health and functionality within his department and within

his life.

## AS AND FOR A FIRST COUNT
### Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e

160.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 159 inclusive of this complaint, with the same force and effect as though herein fully set forth herein.

161.    The Defendant, BNL discriminated against the Plaintiff in his employment based on Plaintiff's race, color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

162.    As a direct result of said acts, Plaintiffs suffered and continue to suffer distress, humiliation, embarrassment, great financial expense and damage to his reputation.

163.    Defendant, BNL, violated public policy in discriminating against Plaintiff s because of their race and color.

164.    As a result of BNL'S acts, Plaintiffs are entitled to the maximum monetary damages and penalties available by law, as well as costs and attorneys fees.

## AS AND FOR A SECOND COUNT
### New York State Executive Law § 296 (Human Rights Law)

165.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 164 inclusive of this complaint, with the same force and effect as though fully set forth herein.

166.    Defendants wrongfully discriminated against plaintiffs , on the basis of their race and color in the terms, conditions, privileges, and compensation of their employment, and in unlawfully altering and damaging their employment relationships in violation of New York's Executive Law § 296.

167.    Defendants knew in advance of the occurrence, of the discriminatory action taken

31

against the plaintiffs but negligently, recklessly and intentionally failed to prevent such acts.

168.    Upon information and belief, Defendants were aware that illegal and discriminatory actions were and would be taken against the Plaintiffs but took no actions to prevent such conduct, and thereby condoned such adverse acts taken against the Plaintiff.

169.    Defendants violated public policy in discriminating against Plaintiff TARDD because of his race and color.

170.    As a result of Defendants acts, Plaintiff suffered and is entitled to a sum in excess of $5,000,000 in compensatory damages.

### AS AND FOR A THIRD CAUSE OF ACTION
### 42 U.S.C. §2000d– Title VI

171.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through170 with the same force and effect as though fully set forth herein.

172.     BROOKHAVEN NATION LABORATORY receives federal financial assistance, which, in part, is aimed at employment.

173.    The above discriminatory practices based on race, color, and national origin, by defendant BROOKHAVEN NATION LABORATORY  its agents and employees violates Title VI, 42 USC §2000(d).

174.    As a direct result of said acts plaintiffs have suffered and continues to suffer loss of income, injury to his career, loss of other employment and retirement benefits, and has suffered and continues to suffer distress, humiliation, embarrassment, great financial expense and severe damage to their reputations.

175.    As a result of defendant's acts, plaintiff suffered and is entitled to damages sustained to date and continuing in the amount of $5,000,000.00.

32

## AS AND FOR A FOURTH COUNT
## <u>BREACH OF CONTRACT</u>

176.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 176 inclusive of this complaint, with the same force and effect as though fully set forth herein.

177.    The Defendant, BROOKHAVEN NATIONAL LABORATORY, extended an offer of employment to Plaintiffs which carried with it, the implied promises that Plaintiffs would be treated fairly and in good faith and not discriminated against due to race and color, during the course of their employment with the Defendant.

178.    The terms and statements contained in Defendants' Employee Handbook created an implied contract with the plaintiffs, that defendants would not unlawfully discriminate against the plaintiffs during their employment relationship with respect to its personnel decisions.

179.    The Plaintiffs accepted the offer of employment and its implied promises.

180.    The Plaintiffs performed in a satisfactory manner throughout the duration of their employment with the Defendant BROOKHAVEN NATIONAL LABORATORY.

181.    The Defendant BROOKHAVEN NATIONAL LABORATORY breached its duties to the Plaintiff under the implied contract by allowing its employees and agents to commit blatant callous discriminatory acts against plaintiffs, while failing to prevent and/or protect the plaintiffs against said acts. The Defendant BROOKHAVEN NATIONAL LABORATORIES also breached its duties to the Plaintiffs under the implied contract by retaliating against, mistreating and creating a hostile working environment for Plaintiffs, when attempting to protect their rights.

182.    In addition, the Defendants agreed with Plaintiff, TARDD, in a written settlement agreement to certain and specific terms. Defendants knowingly and willfully viol terms of that agreement to the detriment of plaintiff TARDD.

33

183.    Defendants offered Plaintiff WHITE an opportunity to participate in the policy-making within BNL with regard to addressing issues of racism and discrimination. Upon accepting and exercising the terms as offered by BNL, BNL breached its duty and violated the terms of the proposed and accepted agreement.

184.    As a result of Defendants acts, Plaintiffs suffered and is entitled to a sum in excess of $5,000,000 in compensatory damages.

**AS AND FOR A FIFTH COUNT**
**42. U.S.C § 1981**

185.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1through184 inclusive of this complaint, with the same force and effect as though herein fully set forth.

186.    The above described discriminatory pattern and practice based on race and color by Defendants violate 42 U.S.C. §1981 as amended by the Civil Rights Restoration Act of 1991 (Publ. Law No. 102-406).

187.    As a direct and proximate result of said acts, Plaintiffs have suffered and continue to suffer emotional distress, humiliation, great expense, embarrassment, and damage to their characters and reputations.

188.    Because of Plaintiffs' color they have  subjected to abuse and mistreatment as detailed above and have been treated differently than white individuals.

189.    Defendant violated public policy in discriminating against Plaintiff s because of their race race and color.

190.    As a result of Defendants' acts, Plaintiffs suffered, and is entitled to damages sustained to date and continuing in excess of $5,000,000.00 as well as punitive damages, costs and attorney's fees.

**AND AS FOR A SIXTH COUNT:**
**42 U.S.C. §§ 1985 (3) & 1986**

191.    The plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1 through 190 of this complaint with the same force and effect as though fully set forth herein.

192.    The above discriminatory and retaliatory actions, pattern and practices based on race and color by defendants, their agents and employees violates plaintiffs' civil rights.

193.    Each defendant knew or should have known that their actions constituted a discriminatory practice based on plaintiffs' race and color.

194.    Each defendant knew and agreed either openly or tacitly that they would take affirmative steps to discriminate against plaintiffs based on each of their race and color.

195.    None of the defendants took actions to prevent, divulge or reverse the wrongful plan and actions being taken against plaintiffs to discriminate, humiliate, and harass them, and to unlawfully alter and damage their employment relationships.

196.    Defendants, and each one of the individually named defendants acquiesced and contributed to the conspiracy to violate plaintiffs' rights; by orchestrating, contributing to and engaging in a conspiracy to have Plaintiffs harmed because of their race and color.

197.    Each of the Defendants condoned the wrongful, discriminatory, reckless, careless and intentional acts taken as set out herein and each had an affirmative responsibility to prevent expose and reverse said wrongful discriminatory reckless, careless and intentional acts but instead joined in this conspiracy against plaintiffs because of their race and color.

198.    As a direct result of said acts, Plaintiffs have suffered and continue to suffer loss of employment opportunity, proper terms and conditions of employment, loss income, injury to career, loss of other employment and retirement benefits and have suffered and continue to suffer distress, humiliation, physical injury, embarrassment and damage to their reputations.

199.    As a result of Defendants' acts plaintiff suffered and is entitled to damages sustained

35

to date and continuing in the amount of $5,000,000.00.

## PRAYER FOR RELIEF

Plaintiff requests judgment as follows:

a.      First Count: for a sum equal to the maximum amount of damages permitted by law;

b.      Second Count: in excess of $5,000,000, in compensatory damages, and a sum for punitive damages;

c.      Third Count: in excess of $5,000,000, in compensatory damages;

d.      Fourth Count: in excess of $5,000,000, in compensatory damages;

e.      Fifth Count: in excess of $5,000,000, in compensatory damages;

f.      Sixth Count: in excess of $5,000,000, in compensatory damages;

f.      Attorney's fees and costs, pursuant to 42 U.S.C. § 2000e-5(k);

g.      A declaratory judgment stating that Defendants wilfully violated Plaintiffs' rights secured by federal and state laws as alleged herein;

h.      Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

i.      An order granting such other legal and equitable relief as the court deems just and proper.


## PLAINTIFFS DEMAND A TRIAL BY JURY

dated:  Hempstead, New York
        November 8, 2004

                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON


                      By:     _____
                              FREDERICK K. BREWINGTON (FB 5295)
                              *Attorneys for Plaintiff*
                              50 Clinton Street, Suite 501
                              Hempstead, New York  11550
                              (516) 489-6959