**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
MALRY TARDD and OTTO WHITE,

                              Plaintiffs,

                -against-

BROOKHAVEN NATIONAL LABORATORY,
a.k.a. and/or d/b/a BROOKHAVEN SCIENCE
ASSOCIATES, CONRAD FORSTER, in his
individual and official capacity; MICHAEL
GOLDMAN, in his individual and official capacity;
WILLIAM HEMPFLING, in his official and
individual capacity; SUE FOSTER, in her official
and individual capacity; WALTER DEBOER, in his
official and individual capacity; STEVE DIERKER,
in his official and individual capacity; ED HAAS,
in his official and individual capacity; MICHAEL
CARUSO, in his official and individual capacity;
MICHAEL BEBON, in his official and individual
capacity; DEREK LOWENSTEIN, in his official
and individual capacity; WILLIAM GUNTER, in
his official and individual capacity; THOMAS
SHERIDAN, in his official and individual capacity;
PETER PAUL, in his official and individual
capacity; KENNETH BROG, in his official and
individual capacity,

                            Defendants.
-------------------------------------------------------X

                              **MEMORANDUM OF**
                            **DECISION AND ORDER**
                              04 CV 3262 (ADS)

**APPEARANCES:**

**LAW OFFICES OF**
**FREDERICK K. BREWINGTON, ESQ.**
Attorneys for the Plaintiffs
50 Clinton Street, Suite 501
Hempstead, New York 11550
          By:    Frederick K. Brewington, Esq.
                   Gregory Calliste, Jr., Esq., of Counsel

**MORGAN, LEWIS & BOCKIUS, LLP**
Attorneys for the Defendants
101 Park Avenue
New York, New York 10178
        By:    Christopher A. Parlo, Esq.,
              Amanda N. Slatin, Esq., of Counsel

**SPATT, District J.**

Malry Tardd and Otto White (collectively, the "plaintiffs") commenced this action against the Brookhaven National Laboratory, a.k.a and/or d/b/a Brookhaven Science Associates ("BNL" and "BSA"), Conrad Foerster, Michael Goldman, William Hempfling, Sue Foster, Walter Deboer, Steve Dierker, Ed Haas, Michael Caruso, Michael Bebon, Derek Lowenstein, William Gunther, Thomas Sheridan, Peter Paul, and Kenneth Brog, (collectively, the "defendants") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e) et seq. ("Title VII"); 42 U.S.C. § 2000(d) et seq. ("Title VI"); 42 U.S.C. §§ 1981, 1983, 1985, and 1986.  All of the individual defendants are sued in their official and individual capacities.

The plaintiffs claim that the defendants discriminated against them on the basis of their race during the course of their employment at BNL.  Specifically, the plaintiff Tardd alleges that the defendants created a hostile work environment, retaliated against him, caused him to be constructively discharged, and breached a settlement agreement that he entered into with the company in response to his previous complaint of discrimination.  The plaintiff White alleges that the defendants failed to promote

2

him on account of his race, retaliated against him, and that he was constructively discharged.

Presently there are two motions before the Court.  The defendants have made motions (1) to strike the plaintiffs' jury demand on the issue of lost wages; and (2) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  The defendants seek summary judgment on all of White's claims, and on Tardd's breach of contract, Title VI, Section 1985, and Section 1986 claims and all of Tardd's claims arising out of acts committed prior to the time that Tardd entered into a settlement agreement in August 2001.

## I.      BACKGROUND

### A.      The Third Amended Complaint

The following facts are derived from the allegations in third amended complaint, the parties' Rule 56.1 statements, and the affidavits and exhibits submitted by the parties.  The following material facts are not in dispute unless specifically noted.

#### 1.      BNL and BSA

According to a Department of Energy website, BNL is a National Laboratory, or a "United States Department of Energy research facility," founded in 1947.  BSA is a nonprofit, limited-liability company, founded in 1997 that currently operates BNL

for the Department of Energy in partnership with the Research Foundation of the State University of New York and the Battelle Memorial Institute.

BNL employs scientists, engineers, technicians and support staff, for the purpose of conducting research in physical, biomedical, and environmental sciences, and energy technologies. The individual defendants are current or former employees of BNL who held various positions during the relevant time period.

### 2.    Malry Tardd

The plaintiff Tardd is an African-American man born on August 25, 1955. Thus, Tardd is currently fifty-one years old and was forty-eight years old when this action was commenced. Tardd began working for BNL in 1975 as a "Mechanical Technician" and has since held various positions. At the time that this action was commenced, Tardd was employed at BNL as a "Vacuum Technical Specialist (Technical Associate II)."

On or about December 9, 1996, Tardd filed a charge of discrimination against BNL with the New York State Division of Human Rights (the "NYSDHR") alleging race discrimination (the "December 1996 Complaint"). As a result of the December 1996 Complaint, the parties entered into a settlement agreement that was finalized and signed in August, 2001 (the "Settlement Agreement").

In the third amended complaint, Tardd alleges that shortly after the terms of the Settlement Agreement were agreed upon, but prior to its execution, he began to

4

face a hostile work environment and was retaliated against.  The most serious instances of alleged conduct include witnessing Caruso in the work area of the laboratory wearing "a white Ku Klux Klan hood with the letters 'KKK' clearly written on the side of the hood in black magic marker"; "discover[ing] a rope, tied into the form of a 'hangman's noose,' draped and hung over the door of his office"; finding "a doll that was hanging on a string by its neck" hung outside his office door; and co-workers' use of racial slurs.

In addition to this conduct the plaintiff alleges that he was subjected to less overt forms of racial discrimination and retaliation.  For example, Tardd claims that his supervisor stopped communicating with him; began overburdening him with assignments that demanded much of his time; and precluded him from being able to position himself to become eligible for a promotion.  Tardd also claims that he was excluded from gatherings and meetings; received weak job-performance evaluations; the "lowest pay raises in his group"; and was assigned a "mentor."  According to the third amended complaint, no Caucasian co-workers received comparable treatment and despite his complaints, BNL refused to investigate the matter.

In the December 1996 Complaint, Tardd complained that he applied for a position within BNL and was informed that he would be required to "pass a course to become certified in order to take the position."  Tardd could not take the necessary course because he lacked prerequisites, and informed BNL of this.  BNL then solicited

5

applications for the position from outside of BNL and ultimately hired a "White" employee. Tardd alleged that the white employee was not certified for the position, and that he was told that certification was required as a pretext for discrimination.

On May 15, 2001, the NYSDHR held a pre-hearing conference related to Tardd's allegations in the December 1996 Complaint. At his deposition, Tardd testified that the incident with the "white Ku Klux Klan hood" was discussed at this conference. There is no dispute that the incident with the white hood occurred before the settlement agreement was signed. Tardd testified at his deposition that he could estimate that it happened sometime "before Christmas" in 2000.

On August 2, 2001, Tardd signed the August 2001 Settlement Agreement, which provides, in part:

The terms of said stipulation agreed upon by the parties are as follows:

1.    [BNL] shall continue to adhere to the Human Rights Law of the State of New York. . . .

3.    In full and final settlement of any and all claims arising out of the allegations of this complaint, [BNL] agrees to promote [Tardd] to a Mechanical Technician position, classified as a T4, at a salary of Sixty Thousand ($60,000) Dollars per year effective July 10, 2001. In full and final settlement of any and all claims arising out of the allegations of this complaint [BNL] agrees to pay and [Tardd] agrees to accept, a lump sum of Twenty Two Thousand Five Hundred Dollars ($22,500) as compensatory damages. . . .

5.    [Tardd] acknowledges and agrees that the payments provided pursuant to this Agreement are in full discharge of any and all liabilities and obligations of Brookhaven National Laboratory

6

Associated Universities, Inc.  In consideration for the payments to be provided to [Tardd] pursuant to paragraph 3 above, [Tardd], and his heirs, executors, administrators, trustees, and assigns (hereinafter 'Releasors') forever release and discharge [BNL] and its parent entities, subsidiaries, division, affiliates, directors, officers, fiduciaries, agents, employees from any and all claims, demands, causes of action, liabilities of any kind, whether known or unknown which [Tardd] had, or may have had against the Company Entities up to the date on which [Tardd] signs the Agreement.

6.      This Agreement is intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities arising out of [Tardd's] employment up to the date on which Complainant signs the Agreement.

7.      [Tardd] acknowledges that he shall have at least twenty-one (21) days to consider the terms and conditions of this Agreement.  After executing this Agreement, [Tardd] shall have seven (7) days to revoke this Agreement . . . .

8.      [Tardd] acknowledges and agrees that he will keep the terms and conditions of this Agreement Confidential, except that [Tardd] may disclose the Agreement to his immediate family members, counsel, or tax advisor.  [The parties] may disclose this information as may be required by law.

Goldman Aff. Ex. 1.

On August 6, 2001, Tardd sent an email to Michael Goldman, General Counsel for BSA.  Goldman Aff. Ex. 2.  In the email, Tardd stated that he is concerned that he may have settled for too small an amount of compensation; that he is considering having the Settlement Agreement reviewed by a "new much more experienced law

firm"; and that he is "afforded the right of change up to seven days past receiving the unseen moneys."  Goldman Aff. Ex. 2.

After the execution of the Settlement Agreement, Tardd was appointed to the "T4" position with an annual salary of $60,000.  The $60,000 salary was "processed effective July 10, 2001."  Also, Tardd received a lump sum of payment of $22,500 and was appointed as EEO representative for BNL.

Since the time that he left BNL, Tardd has not engaged in any employment, nor has he sought to find work of any kind.  Tardd spends his days working on his house, exercising, and working in his yard.  Tardd testified that he does not work because he is "permanently disabled" because of anxiety.

### 3. Otto White

Otto White is a African-American man born on July 20, 1943.  Thus, White is now sixty-three years old and was sixty-years old at the time that this action was commenced.  White began working for BNL in 1974 as an "industrial hygienist."  White held various positions during his twenty-nine year employment with BNL, which ended with his retirement in November, 2003.

In or about October 2002, the position of "Assistant Laboratory Directory - Environment, Safety, Health and Quality" ("ALD - ESH&Q") became open at the labs.  BNL formed a committee to conduct the interview process and select someone to fill the role (the "Selection Committee").  The defendant Sheridan was the "chair"

8

of the Selection Committee and selected the other members.  The entire Selection Committee consisted of the defendants Sheridan, Bebon, Hempfling, Lowenstein, Gunther, and Brog.  Everyone on the Selection Committee is Caucasian.

BNL received ten applications for the ALD - ESH&Q position from current employees and non-employees.  White applied for the position.  He was the only African-American candidate.  After reviewing the application material from the candidates, BNL concluded that four of the applicants were qualified for the position: the plaintiff White, Peter Knollmeyer ("Knollmeyer"), James Tarpinian ("Tarpinian"), and Jan Preston ("Preston").

To complete the selection process, the Selection Committee conducted an interview with each of the four remaining candidates.  At the interview, each candidate would be asked twenty-four identical questions, and two to four questions that were unique to each candidate.  The questions were arranged into categories which reflected the professional qualities of the applications.  Each member of the Selection Committee separately rated and gave scores to each candidate based on the candidate's performance during the interview.   Specifically, the Selection Committee awarded "points" to each candidate in the categories of: (1) "Personnel Mgt. Philosophy & Approach"; (2) "Service Mgt. Philosophy & Approach"; (3) "Relationship Mgt. Experience"; (4) "Performance Based Mgt. Experience"; (5) "SBMS Experience; (6) "Integrated Planning & Assessment Exp.";

9

(7) "Experience with [the Department of Energy]"; (8) "Interpersonal/Communication Skills"; (9) "Education"; and (10) "Candidate Specific Questions." Hempfling Aff., Ex. 19. Each category was ascribed a "point" value, and there was a total of 100 points available to each candidate for each member of the six-person Selection Committee, or 600 points.

Following the interview process, White was awarded 331 points. Tarpanian was awarded 437 points. Knollmeyer was awarded 451 points. Preston was awarded 332 points. This scoring resulted in an average score for White that was 66, in comparison to an average score of 90 for Knollmeyer, and 87 for Tarpinian. Based on these scores, the Selection Committee offered the position to Knollmeyer, who turned it down. Tarpinian was then offered the position. On January 10, 2003, Tarpinian accepted the position. On June 27, 2003, White filed a charge of discrimination with the EEOC.

On October 13, 2003, the White retired from his position with BNL as part of an early retirement program and accepted a severance package. White has not worked since he retired from BNL, and he testified that he has not attempted to find employment since late 2005.

## II.    DISCUSSION

### A.    As to the Defendants' Motion to Strike

Rule 39(a) provides:

> When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless . . . the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

Fed. R. Civ. P. 39(a). Under Rule 39(c), even in those actions not triable of right to a jury the court, "with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right." Fed. R. Civ. P. 39(c). Where a party requests a jury trial on the issue of lost wages, and the other party fails to object, such silence may be deemed "consent" under Rule 39(c). Broadnax v. City of New Haven, 415 F.3d 265, 272 (2d Cir. 2005).

In their third-amended complaint, the plaintiffs state that a "jury trial is demanded." The defendants have made this motion to strike the plaintiffs' jury demand to the extent that it is meant to cover their demand for lost wages. The defendants are correct that a party generally is not entitled to a jury trial on the issue of lost wages in a Title VII case. Broadnax, 415 F.3d at 270-71 ("Because a lost wages award-whether in the form of back pay or front pay-is an equitable remedy, a party is generally not entitled to a jury determination on the question.") (citing Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 157 (2d Cir. 2001)).

The plaintiffs' argument that the defendants have "consented" to a jury trial on the issue of lost wages because they failed to object in any respect to the plaintiff's broad jury demand before the time that they made this motion is not well-taken. Rule

39 contains no express time limitation within which an objection to a jury trial must be made, and the plaintiff's cite to no authority supporting any time limit.  In the Broadnax case, the issue of lost wages had actually been submitted to a jury for a determination without any objection from the defendant.  On appeal, the Second Circuit held the defendant was not entitled to relief from the verdict because it had acquiesced in the procedure of having the jury determine that issue.  Broadnax, 415 F.3d at 270-71

Here, the defendants have objected to the plaintiffs' jury demand on the issue of lost wages prior to the trial.  The plaintiffs have not provided the Court with any authority suggesting that the motion is untimely.  Thus, the Court finds that the defendants' motion to strike the plaintiffs' jury demand on the issue of lost wages is proper.  Accordingly, the defendants' motion to strike the plaintiffs' jury demand as to the issue of lost wages is granted.  See Robinson, 267 F.3d at 157 ("Because back pay and front pay have historically been recognized as equitable relief under Title VII, neither party was entitled to a jury trial.").

### B.      Summary Judgment Standard

Summary judgment is proper only where no genuine issue of material fact exists to present to the jury.  Rule 56 of the Federal Rules of Civil Procedure states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed R. Civ. P. 56(c).

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The moving party bears the burden of establishing the absence of a genuine issue of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986).  Once the moving party has offered evidence that no genuine issue of material fact remains, the burden shifts to the non-moving party to provide evidence that a genuine, triable issue remains.  Id. at 250.  It is well-settled that the non-moving party cannot defeat summary judgment with nothing more than unsupported assertions or the allegations in its pleadings.  Fed. R. Civ. P. 56(e); Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996); Goenaga v. March of Dimes Birth Defects Found., 51 F. 3d 14, 18 (2d Cir. 1995).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.  See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513; Vann v. City of N.Y., 72 F.3d 1040, 1048-49 (2d Cir. 1995).  Notably, "the trial

13

court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo v. Prudential Residential Servs. Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994); see Donahue v. Windsor Locks Board of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987) (holding that on a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried").

### C.       As the Defendants' Motion for Summary Judgment

#### 1.       As to Tardd's Breach of Contract Claim

This cause of action is based on the Settlement Agreement.  A settlement agreement is a contract and therefore the same legal principles governing cases involving general contract disputes apply.  See Red Ball Interior Demolition Corp. v. Paladessa, 173 F.3d 481, 484 (2d Cir. 1999); Goldman v. Comm'r of Internal Revenue, 39 F.3d 402, 405 (2d Cir. 1994).  To state a claim for breach of a settlement agreement, a complaint need only allege: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of the agreement by the defendant; and (4) damages.  Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); see Ainbinder v. Potter, 282 F. Supp. 2d 180, 188 (S.D.N.Y. 1993) (denying motion to dismiss where plaintiff alleged the existence of a settlement agreement, the defendant's failure to comply with the terms of the agreement, and damages).

14

In this case, Tardd contends that the defendants breached those portions of the Settlement Agreement that required BNL to (1) "adhere to the Human Rights Law of the State of New York"; and (2) "cooperate with the [NYSDHR] in any compliance review of [that] matter."  However, a promise to do something that a party is already obligated by law to do is not enforceable.  See, e.g., N.Y. Jur. Contracts § 97.  Stated another way,

> [t]he performance of an existing legal obligation or a promise to do that which the promisor is already legally bound to do does not constitute a valid consideration for an agreement.  Thus, neither the promise to do a thing, nor the actual doing of it, will be a good consideration if it is a thing which the party is bound to do by the general law.

Id. (footnotes omitted).

Tardd also claims that the defendants breached paragraph eight of the Settlement Agreement by disclosing the terms of the Settlement Agreement to Tardd's co-workers and supervisors.  However, the confidentiality provision in the Settlement Agreement only applied to Tardd.  There was no reciprocal obligation of confidentiality on the part of the defendants.

Under the Settlement Agreement, the defendants' obligations were to promote Tardd to a T4 Mechanical Technician, increase his salary to $60,000, and pay him a lump sum of $22,500.  Tardd does not claim that the defendants failed perform any one of these obligations.  Thus, the defendants are entitled to summary judgment on

this breach of contract claim.  Accordingly, Tardd's breach of contract claim is dismissed.

> **2.     As to Tardd's Claims Concerning Actions Occurring Prior to the Settlement Agreement**

The defendants argue that any of Tardd's claims relating to conduct that occurred before the date that the parties executed the Settlement Agreement must be dismissed because Tardd released the defendants from all claims up to the time that the agreement was entered.

The Settlement Agreement provides:

> 5.     [Tardd] acknowledges and agrees that the payments provided pursuant to this Agreement are in full discharge of any and all liabilities and obligations of Brookhaven National Laboratory Associated Universities, Inc.   In consideration for the payments to be provided to [Tardd] pursuant to paragraph 3 above, [Tardd], and his heirs, executors, administrators, trustees, and assigns (hereinafter 'Releasors') forever release and discharge [BNL] and its parent entities, subsidiaries, division, affiliates, directors, officers, fiduciaries, agents, employees from any and all claims, demands, causes of action, liabilities of any kind, whether known or unknown which [Tardd] had, or may have had against the Company Entities up to the date on which [Tardd] signs the Agreement.

> 6.     This Agreement is intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities arising out of [Tardd's] employment up to the date on which [Tardd] signs the Agreement.

"Under New York law, a release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced." Pampillonia v.

RJR Nabisco, Inc., 138 F.3d 459, 463 (2d Cir. 1998) (quoting Skluth v. United Merchants & Mfrs., Inc., 163 A.D.2d 104, 106, 559 N.Y.S.2d 280, 282 (1st Dep't 1990).  Tardd does not argue that the Settlement Agreement is unclear or ambiguous, or that he did not enter into the Settlement Agreement knowingly and voluntarily.  Indeed, in the EEOC charge that Tardd filed prior to commencing this action, he states that "the terms of [the Settlement Agreement] were discussed at length in front of Judge Mercedes Colwin and Mike Goldman, Counsel for Respondent."  Parlo Aff., Ex. 15.

Accordingly, the Court finds that Tardd knowingly and voluntarily released any claims against the defendants arising out of facts occurring before August 2, 2001.  Any of Tardd's claims in the third amended complaint that pre-date August 2, 2001 are dismissed.  Because there is no dispute that the incident involving the white hood occurred before the date that the Settlement Agreement was executed, any cause of action based on this incident is also dismissed.

### 3.      As to Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  For purposes of Title VI, a the term "program or activity" and the term "program" can mean "an entire corporation,

partnership, [or] private organization." 42 U.S.C. § 2000d-4a(3)(A). The statute

covers "only those situations where federal funding is given to a non-federal entity

which, in turn, provides financial assistance to the ultimate beneficiary."

Soberal-Perez v. Heckler, 717 F.2d 36, 38 (2d Cir. 1983). Moreover, "for a claimant

to recover under Title VI against an employer for discriminatory employment

practices, a threshold requirement is that the employer be the recipient of federal funds

aimed primarily at providing employment." Ass'n Against Discrimination in

Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981).

It has become apparent to the Court that BNL does not fit the definition of

"program or activity" under Title VI. BNL is a federal research facility maintained by

the Department of Energy, and Courts hold that Title VI does not apply against direct

federal operations and agencies. See Wise v. Glickman, 257 F. Supp. 2d 123, 131-32

(D.D.C. 2003) (The "comprehensive definition [of program or activity] does not

include the operations of the federal government and its agencies, and, indeed, the

case-law recognizes that a plaintiff may not bring suit under Title VI for programs

maintained directly by federal agencies."); Williams v. Glickman, 936 F. Supp. 1, 5

(D.D.C. 1996) ("Title VI does not apply to programs conducted directly by federal

agencies") (internal citation omitted); Soberal-Perez, 717 F.2d at 38 ("Title VI . . . was

meant to cover only those situations where federal funding is given to a non-federal

entity which, in turn, provides financial assistance to the ultimate beneficiary");

18

Marsaw v. Trailblazer Health Enters., LLC, 192 F. Supp. 2d 737, 750 (S.D. Tex.

2002) ("Title VI does not apply to programs administered directly by a federal

agency"); J. & L. Parking Corp. v. United States, 834 F. Supp. 99, 104-05 (S.D.N.Y.

1993) (plaintiff had no cause of action under Title VI with regard to programs

administered directly by federal government).  Thus, the Court will grant summary

judgment on the plaintiffs' Title VI claims against BNL.

It is less clear whether the same rule applies to BSA, which is a contractor of

the federal government through BNL.  The defendants argue that summary judgment

in their favor is appropriate against both BNL and BSA because the plaintiffs merely

allege, "without any factual citation or support," only that the defendants receive

"'federal financial assistance, which, in part, is aimed at employment.' "  In response,

the plaintiffs argue incorrectly that it is the defendants' burden to show that they do

not receive federal funds aimed at providing employment.

According to the Supreme Court, "the plain language of Rule 56(c) mandates

the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of

proof at trial."  Celotex Corp., 477 U.S. at 322.  "The moving party is 'entitled to a

judgment as a matter of law' because the nonmoving party has failed to make a

sufficient showing on an essential element of h[is] case with respect to which []he has

the burden of proof." Id. at 323.  Therefore, it is the plaintiffs' burden to produce evidence that BNL and BSA receive federal funds aimed primarily at providing employment.

Here, the only evidence that the plaintiffs provide regarding the defendants' receipt of federal funds for the purpose of providing employment is a report purported to be from the Department of Energy website.  The report is entitled "Supplemental Support Cost by Functional Activity Information."  The document apparently was not obtained through discovery and the defendants raise a concern about the report's authenticity and admissibility.

Assuming this document is properly before the Court, it does not in any way establish that BNL and BSA receive federal funds aimed primarily at providing employment.  Thus, the plaintiffs have no evidence that supports this essential element of their Title VI cause of action.  Accordingly, the defendants' motion for summary judgment on the plaintiffs' Title VI claim is granted.

### 4.    As to Section 1985(3) and 1986

Section 1985(3) prohibits "two or more persons" from "consp[iring] . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."  42 U.S.C. § 1985(3). Under this law, a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal

privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.  See Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999).  The defendants argue that they are entitled to summary judgment on the plaintiffs' Section 1985(3) claim because (1) the plaintiffs failed to allege a cognizable legal basis for their Section 1985(3) claim; (2) the record contains no evidence of any agreement among any of the defendants to engage in a conspiracy; and (3) even if the plaintiffs properly alleged and had evidence to prove a Section 1985(3) claim, the "intracorporate conspiracy doctrine" bars any such claim in this case.

As evidence of the defendants' conspiracy, the plaintiffs point to several pieces of evidence.  In Tardd's declaration, he states that the defendant DeBoer convened a group meeting with Tardd's fellow employees without Tardd present.  Affidavit of Malry Tardd ("Tardd Aff."), ¶ 28.  This meeting took place "immediately after" the parties signed the Settlement Agreement.  Tardd states that he learned from a colleague that at the meeting DeBoer instructed Tardd's co-workers not talk to him during the day, "only to casually say hello in the morning."  Id.

Next, the plaintiffs refer the Court to an internal BSA memorandum.  In the memorandum, the defendant Haas details the results of an investigation he conducted into Tardd's expressed dissatisfaction with a performance appraisal.  Brewington

Decl., Ex. FF.  As one of his "findings," Haas notes that Tardd has had problems

"interacting with others."

> He will not accept constructive criticism and act appropriately.
> Malry often chooses to interpret actions and statements as racially
> motivated if not favorable to him, making it difficult to discuss
> controversial issues with him without being accused of racial
> discrimination.  Malry will often redirect attention toward claimed
> past "incidents of harassment" when dealing with issue where his
> performance needs improvement.  Managers and co-workers are
> therefore unfairly placed in a position of having to (1) defend
> themselves often to supply proof that their actions/statements are not
> racially motivated, or (2) ignore Malry's comments.  Either way, this
> behavior limits Malry's ability to improve because of his
> unwillingness to recognize and correct his own mistakes.

Id.

Next Tardd claims that he "constantly" complained to his supervisors and

others, "literally, on hundreds of occasions - by email, memos, verbally, etc." and that

the defendants "ignored his complaints and told [him] that [he] was just 'too

sensitive."  Tardd Aff., ¶ 12.

Regarding the plaintiff White, the plaintiffs state in conclusory fashion that

"the evidence demonstrates that Defendants Brog, whom White complained about on

several occasions in the past . . . and Sheridan who admitted that blacks were not

competent for scientific positions at BNL . . . conspired to prevent white from

obtaining the position."  In support of these arguments, the plaintiffs amorphously cite

to the 168 paragraphs that comprise sections I, II, and III of their Rule 56.1 counter-

statement of fact, rather than any specific evidence that would be admissible.

In the Court's view, none of this is evidence of an agreement between any of the defendants to deprive the plaintiffs of their constitutional rights because of their race.  Without an agreement, there can be no conspiracy.  See Gonzalez v. City of New York, No. 99 CIV. 9128, 2000 WL 1678036, *9 (S.D.N.Y. Nov. 8, 2000) (granting summary judgment on Section 1985(3) claim where the plaintiff "offered no evidence suggesting that defendants entered into an agreement to violate his constitutional rights."), aff'd, 38 Fed. Appx. 62 (2d Cir. 2002).  Even if the Court accepted Tardd's testimony regarding a meeting convened by DeBoer shortly after the Settlement Agreement as evidence of a conspiracy, the plaintiffs have not offered any proof that the defendants acted at that meeting with discriminatory racial animus.  Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999).

Because a claim under 42 U.S.C. § 1986 for failure to prevent the violation of a person's civil rights cannot exist in the absence of a viable Section 1985 claim, the plaintiffs' Section 1986 claim are also dismissed.  See Brown v. City of Oneonta, 195 F.3d 111, 123 (2d Cir.1999); Posr v. Court Officer Shield # 207, 180 F.3d 409, 420 (2d Cir. 1999); Graham v. Henderson, 89 F.3d 75, 82 (2d Cir. 1996); Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam).

Accordingly, the defendants' motion for summary judgment with respect to the plaintiffs' section 1985(3) and 1986 claims is granted, and these causes of action are dismissed.

### 5. As to White's Exhaustion of His Retaliation and Constructive Discharge Claims

In the third-amended complaint, the plaintiff White alleges that the defendants' decision not to select him for the ALD-ESH&Q position was retaliation for his support of Tardd's discrimination claims, and that this campaign of retaliation eventually led to his constructive termination.  (Compl. ¶¶ 150, 153, 158, 159).  The defendants argue that White should be prohibited from pursuing causes of action for retaliation and constructive discharge because he did not assert these claims in the charge that he filed with the EEOC.

Individuals may bring Title VII claims in federal court only after filing a timely charge of employment discrimination with the EEOC and receiving an EEOC right-to-sue letter.  42 U.S.C. § 2000e-5(e); <u>Legnani v. Alitalia Linee Aeree Italiane, S.P.A.</u>, 274 F.3d 683, 686 (2d Cir. 2001).  Administrative exhaustion is an essential element of Title VII's statutory scheme, the purpose of which is to avoid unnecessary judicial action by the federal courts by "[giving] the administrative agency the opportunity to investigate, mediate, and take remedial action."  <u>Stewart v. U.S. Immigration & Naturalization Serv.</u>, 762 F.2d 193, 198 (2d Cir. 1985).

There is an exception to this general rule.  In the leading case of <u>Butts v. City of New York Dep't of Housing</u>, 990 F.2d 1397, 1402 (2d Cir. 1993) (internal quotations omitted), <u>superseded by statute on other grounds as stated in</u> <u>Hawkins v. 1115 Legal Serv. Care</u>, 163 F.3d 684 (2d Cir.1998), the Second Circuit delineated three circumstances under which a plaintiff may pursue a claim that was not included in the EEOC charge.

> A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge <u>or are based on conduct subsequent to the EEOC charge which is "reasonably related" to that alleged in the EEOC charge</u>. . . .
>
> The first type of "reasonably related" [is a claim] not raised in the charge . . . where the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. . . .
>
> The second type of "reasonably related" claim is one alleging retaliation by an employer against an employee for filing an EEOC charge. . . .
>
> The third type of reasonably related claim is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner as alleged in the EEOC charge.

<u>Id.</u> at 1402-03 (emphasis added) (citations omitted).

Under the express language of the Second Circuit, this "reasonably related" exception to the exhaustion requirement only applies to "conduct subsequent to the EEOC charge."  <u>Id.</u> at 1402; <u>Alfano v. Costello</u>, 294 F.3d 365, 381-82 (2d Cir. 2002); <u>Daigle v. West</u>,  225 F. Supp. 2d 236, 242-43 (N.D.N.Y. 2002); <u>Woodcock v.</u>

Montefiore Med. Ctr., 48 F. Supp. 2d 231, 235 n. 4 (E.D.N.Y. 1999); Fitzgerald v. Henderson, 36 F. Supp. 2d 490, 502 (S.D.N.Y. 1998) (collecting cases); but see Gardner v. St. Bonaventure Univ., 171 F. Supp. 2d 118, 123-24 (W.D.N.Y. 2001) (declining to adopt a "literal interpretation" of the rule from Butts).  Thus, the defendants motion for summary judgment is granted to the extent that White cannot pursue any Title VII cause of action based on conduct that occurred prior to the time he filed his EEOC charge.  Accordingly, any retaliation cause of action arising out of the defendants failure to promote White to the ALD-ESH&Q position is dismissed.

However, White does allege that he was retaliated against for his filing of the EEOC charge and his pursuit of that administrative remedy.  (Compl. ¶ 157, 159, 159.)  This cause of action fits within the second Butts exception, and will not be dismissed.  Also, the Court will consider White's constructive discharge claims, to the extent that they are based on conduct occurring after he filed his EEOC charge of discrimination.

### 6.      As to White's Title VII Claims

#### a.      Failure to Promote

To establish a prima facie case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that (1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected for the position; and (4) the denial occurred under

circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII. Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004); Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000); Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).  "The burden that such a plaintiff must meet in order to defeat summary judgment at the prima facie stage is 'not onerous,' and has been described as 'de minimis.' " Howley, 217 F.3d at 150 (quoting Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir.1994)).  Here, the defendants challenge the second and fourth elements, contending that the plaintiff cannot show that he was sufficiently qualified for the position he applied for or that the denial of that position to him occurred because of his race.

With regard to the second element, namely the White's qualifications, the plaintiffs have submitted evidence sufficient to defeat a motion for summary judgment.  Specifically, the defendants Sheridan and Paul testified at their depositions that White was qualified for the ALD-ESH&Q position.  See Brewington Decl. Ex. F, 16:19-24, 48:24, 49:1;  Exhibit I, 70:4-16.

As for the fourth element, the plaintiffs have provided some evidence that White was not selected for the ALD-ESH&Q position under circumstances giving rise

to an inference of discrimination.  At the defendant Sheridan's deposition, the

following exchange took place:

> Q.    Do you know or do you believe based on your knowledge that
> within the Brookhaven National Labs, and particularly the
> area that you were knowledgeable of, whether or not any
> form of discrimination based on race had ever occurred
> against an African American? . . .
>
> A.    I don't have any knowledge of any situation like that.
>
> Q.    My question actually goes to your belief as to whether or not
> it had or did occur?
>
> A.    I think that in the past there were situations – First of all,
> there is not a very large black community on the east end of
> Long Island.  It's a very expensive place to work.  Or to live.
> And so there was not a great population to choose from, and
> in particular not that [sic] was technically competent for the
> kinds of jobs that were advertised or offered at Brookhaven
> National Lab except for the areas of mechanics and
> machinists and things like that that [sic] we employed a
> relatively limited number of in our machine shops and
> whatnot that supported the big scientific research machines.
>
> And so I don't think that prior to BSA coming, there
> had been a great deal of effort to go outside and look real
> hard for people of diverse backgrounds, of any kind of
> diverse backgrounds.

Brewington Aff., Ex. F, 84:12-23.  A reasonable juror could consider this testimony as

evidence that Sheridan held the discriminatory attitude that African-Americans are not

technically competent or capable of performing jobs at BNL other than mechanic or

machinists.  A reasonable juror could also conclude, based on Sheridan's role as

"chair" of the Selection Committee, that his discriminatory attitude permeated White's

interview and the selection process.  Although Sheridan did also testify at his deposition that White's performance was "satisfactory" and that he was "very, very knowledgeable of the occupational safety and health business, broadly, and recognized as an expert in the field by a lot of people in and out of the lab," Brewington Aff., Ex. F, 16:21-24, it is not the Court's role at the summary judgment stage to balance these apparently competing portions of Sheridan's testimony.  Based on this testimony, the Court finds that White has satisfied his "de minimus" burden of establishing a prima facie case of discrimination.

As a legitimate, non-discriminatory reason for not selecting White for the ALD-ESH&Q position, the defendants argue that the position was filled through a thorough, impartial selection process and that every member of the Selection Committee independently rated two candidates higher than White by a large margin. The defendants submitted the scoring sheets for each of the four final candidates for the ALD-ESH&Q position.  As stated above, Tarpanian was awarded 437 points. Knollmeyer was awarded 451 points. Preston was awarded 332 points. White was awarded 331 points.  This scoring resulted in an average score for White that was 66, compared to an average score of 90 for Knollmeyer and 87 for Tarpinian.  Based on these scores, the Selection Committee offered the position to Knollmeyer, who turned it down.  Tarpinian was then offered the position, and accepted.

29

Because the defendants have offered a non-discriminatory reason for their decision not to select White for the ALD-ESH&Q position, it is the plaintiffs' burden to present some evidence that this reason is pretextual or not the only reason. In the Court's opinion, White satisfied this burden as well. In his declaration and at his deposition, White testified regarding several matters that raise triable issues of fact that preclude the Court from granting summary judgment on this cause of action.

White testified that the selection process was conducted in a discriminatory manner and that the scoring system was a pretext for the discrimination. As evidence of discrimination, White stated his belief that the selection process did not follow the defendants' normal practices, because the selection committee was comprised entirely of Caucasian males, when in the past Selection Committees "typically" included African-Americans, Hispanics, and women. Brewington Aff., Ex. A, 250:2-9. However, White also testified that he has no knowledge of the composition of any specific prior selection committee. Brewington Aff., Ex. A, 250.

White also testified that the Selection Committee "would have been a good committee for selecting senior managers of the laboratory," but that it was unfair because it did not properly consider his twenty-nine years of experience with BNL. Brewington Aff., Ex. A, 367-370. As the defendants note, White did not provide any evidence other than his opinion that the Selection Committee did not consider his twenty-nine year experience during the selection process.

30

White also claims that after the selection process the defendant Brog told him that he provided the other candidates with material and interview guidelines regarding the topics that would be discussed.  Brewington Aff., Ex. A, 424-425.  However, the defendant Hempfling testified that none of the candidates were given material before their interviews.  Brewington Aff., Ex. E, 70.

White also claims that the questioning of the candidates was discriminatory.  The Selection Committee engaged in a "collaborative process" during which it developed a set of questions to use during the interview process.  A general set of questions was developed, each of which would be asked to all of the candidates.  Also, several questions that were unique to each individual candidate were developed.  White claims that Knollmeyer and Tarpinian were asked questions regarding their qualifications and achievements.  On the other hand, White claims that he was not asked questions about his past achievements, but was asked questions about what he would change at the laboratory.  White construed these questions as invitation to criticize his supervisors, some of whom were on the Selection Committee.

In the Court's view, these are all issues of fact regarding the fairness of the Selection Committee and the interview process, and are material to the question of pretext.  Accordingly, the defendants' motion for summary judgment on White's Title VII failure to promote claim is denied.

**7.      As to White's Constructive Discharge Claim**

The legal definition of a "constructive discharge" is well-defined in the Second

Circuit cases.  As set forth in <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d

62, 73 (2d Cir.2000).  There, the Court stated:

> Constructive discharge of an employee occurs when an employer,
> rather than directly discharging an individual, intentionally creates an
> intolerable work atmosphere that forces an employee to quit
> involuntarily.  Working conditions are intolerable if they are so
> difficult or unpleasant that a reasonable person in the employee's
> shoes would have felt compelled to resign.

<u>Id.</u>; <u>see also</u> <u>Ferraro v. Kellwood Co.</u>, 440 F.3d 96, 101 (2d Cir.2006) ("A plaintiff's

claim for constructive discharge requires the plaintiff to prove that her employer

deliberately and discriminatorily created work conditions 'so intolerable that a

reasonable person in the employee's position would have felt compelled to resign.'

Upon that showing, the employee's decision to resign 'is assimilated to a formal

discharge for remedial purposes.' ") (quoting <u>Pa. State Police v. Suders</u>, 542 U.S. 129,

141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)); <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d

149, 161 (2d Cir. 1998) (same).

As set forth in a major decision in this field, <u>Chertkova v. Connecticut General

Life Insurance Co.</u>, 92 F.3d 81, 90 (2d Cir.1996), in some cases it is the cumulative

effect of adverse conditions, which when taken singly, would not suffice to make out a

constructive discharge.  In <u>Chertkova</u>, this important portion of the rule was clearly set

forth:

32

It is true that if only one of the work conditions enumerated by the district court were present, it might not be enough to demonstrate constructive discharge. Certain factors, standing alone, are legally insufficient to support constructive discharge. See, e.g., Stetson, 995 F.2d at 360 (dissatisfaction with assignments; employee's perception of undue criticism or excessive monitoring; difficult or unpleasant conditions); Pena, 702 F.2d at 325 (disagreement with work plan). But the effect of a number of adverse conditions in the workplace is cumulative.  A constructive discharge occurs if a reasonable person subjected to the same conditions as the plaintiff would have felt compelled to step down.  Because a reasonable person encounters life's circumstances cumulatively and not individually, it was error to treat the various conditions as separate and distinct rather than additive. Viewed as a whole, the facts in the case at hand, if proven, would permit a finder of fact to conclude that Chertkova was forced to resign.

92 F.3d at 90.

In this case, there is a question regarding whether a reasonable person in White's position would have felt compelled to step down.  White testified at his deposition that the defendant Goldman told him that if he pursued his EEOC complaint, that would put him in an "adversarial relationship with the laboratory." Also, White states in his declaration, among other things, that the defendants "re-assigned" safety initiatives that he negotiated to new managers; excluded him from discussions and planning related to safety issues; and produced and distributed "articles of Safety" without his input or credit.   At this stage of the case, the Court finds that a reasonable person under similar circumstances could have felt that he had no other choice but to resign.  Accordingly, summary judgment on White's constructive discharge claim is denied.

**8.     As to White's Section 1981 Claim**

Section 1981 prohibits intentional race-based discrimination in the workplace.

See Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998).  Claims brought pursuant

to Section 1981 are analyzed under the same standards as Title VII claims.  See

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000).  As set

forth above, White has raised material issues of triable fact under Title VII.  For

similar reasons, the Court finds that White also established claims for race

discrimination against the defendants pursuant to Section 1981.  Accordingly, the

defendants' motion for summary judgment on White's Section 1981 claim is denied.

**III.     CONCLUSION**

Based on the foregoing, it is hereby

**ORDERED**, that the defendants' motion to strike the plaintiffs' jury demand

on the issue of lost wages is granted; and it is further

**ORDERED**, that the defendants' motion for summary judgment is granted in

part and denied in part; and it is further

**ORDERED**, that Tardd's cause of action for breach of the Settlement

Agreement is dismissed; and it is further

**ORDERED**, that Tardd's claims that pre-date August 2, 2001 are dismissed;

and it is further

**ORDERED**, that the plaintiffs' Title VI claims are dismissed; and it is further

34

**ORDERED**, that the plaintiffs' Section 1985 and Section 1986 claims are dismissed; and it is further

**ORDERED**, that White's retaliation cause of action based on conduct occurring prior to his EEOC is dismissed; and it is further

**ORDERED**, that the defendants' motion for summary judgment is otherwise denied; and it is further

**ORDERED**, that the parties are directed to appear before the Court on April 3, 2007 at 9:00 a.m. for a status conference.

**SO ORDERED**.

Dated: Central Islip, New York
            March 6, 2007

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Court